STATE OF CONNECTICUT *v.* MICHAEL D'AMBROSIO
(13507)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued May 9—decision released July 4, 1989

*Susan M. Hankins,* assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Patrick Clifford,* assistant state's attorney, for the appellee (state).

PETERS, C. J. This appeal requires an examination of the scope of a defendant's obligation to make a preliminary showing of the materiality of a witness' psy-

chiatric records for the purpose of cross-examination. A jury convicted the defendant of burglary in the third degree, conspiracy to commit burglary in the third degree, attempted assault in the first degree and larceny in the sixth degree. General Statutes §§ 53a-103 (a), 53a-48 (a), 53a-49 (a), 53a-59 (a) (1), 53a-125b. The defendant appealed to the Appellate Court from the trial court's judgment, raising four claims of error. The Appellate Court found no error in the trial court's judgment; *State* v. *D'Ambrosio,* 14 Conn. App. 309, 541 A.2d 880 (1988); and we granted certification limited to the following issue: "Did the Appellate Court err in upholding the trial court's denial of the defendant's request for an examination of the psychiatric records of a key state witness, on the basis that there had been no preliminary showing that denial was likely to impair his right to confrontation?" *State* v. *D'Ambrosio,* 209 Conn. 802, 548 A.2d 439 (1988). We now reverse.

The jury could reasonably have found the following facts. On October 29, 1985, the complainant, a seventy-nine year old Guilford woman, discovered that the rear door to her house had been smashed. One of the complainant's neighbors told police that she had seen a heavy set white male in dark clothing, later identified as Albert Knous, run down the driveway and enter a dark colored car with a white top. Approximately forty-five minutes later, a police officer spotted the defendant and Knous in a car matching the neighbor's description. *State* v. *D'Ambrosio,* supra, 14 Conn. App. 310–11. After further investigation linking both the defendant and Knous to the incident, the police charged the defendant with burglary, conspiracy to commit burglary in the third degree, attempted assault in the first degree, carrying a weapon in a motor vehicle and larceny in the sixth degree.

At the defendant's trial, Knous testified for the state that he was picking apples on the day of the incident when the defendant approached him to tell him he had broken

into the complainant's home, that a companion had cut the brake lines to the car stored in the garage[1] and that the defendant had stolen a metal tool box. Knous also stated that the defendant reported having seen a television set in the house, which he wanted Knous to help him steal so that they could sell it and divide the proceeds. Knous testified that the pair then went to the house and he entered through the rear door, which he claimed had been smashed previously. He then searched the house for valuables, looked in the medicine cabinet for drugs and left without taking anything when he heard a car in the driveway. Id., 312.

Prior to cross-examination and outside the jury's presence, defense counsel questioned Knous about his treatment for alcoholism at Connecticut Valley Hospital. Knous stated that, as a condition of his probation stemming from previous charges, he had been admitted to a twenty-eight day alcohol program. He admitted he had been drinking heavily for two years prior to entering the alcohol program and had occasionally used other drugs. He also admitted he had been drinking on the day of the incident. Defense counsel inquired whether he had been drinking excessively that day, to which Knous answered, "I had been drinking. Excessive, I don't know." Id., 316.

Defense counsel then asked Knous a series of questions regarding his diagnosis, the psychiatric reasons for his hospitalization and the reasons why the program directors had recommended that he enter a halfway house.[2] The trial court sustained all of the state's objec-

---

[1] The defendant and the complainant had been involved in an auto accident the previous day and the defendant had damaged his car extensively. According to Knous, the defendant seemed upset that his insurance would not cover his damages and apparently intended the burglary as retribution.

[2] The transcript of defense counsel's questioning of Knous reads, in relevant part:

"Q. Did you get a diagnosis as a result of your stay at Connecticut Valley Hospital?

tions to these questions on the ground of the witness' psychiatric privilege. The defendant then requested access to Knous' psychiatric records or, alternatively, that the court inspect the records in camera to determine if they contained any impeaching material. The court denied the defendant access to the records and declined to examine them itself, concluding that counsel had failed to make a preliminary showing that the failure to inspect the records would deny the defendant his right to confrontation.

After the trial court rendered judgment on his convictions, the defendant appealed to the Appellate Court arguing that the trial court had violated his sixth amendment right to confrontation by precluding him

"A. Diagnosis?

"Q. Did they tell you what was wrong with you, if anything?

"A. They didn't tell me. I told—

"Mr. Clifford: I would object because it might get into this privileged area, your Honor, whether he had seen a psychiatrist. There is a privilege involved here. Counsel can't put on a showing by violating the psychiatric/client privilege. The showing has to be independent of that. Asking the questions is just the same as opening up that envelope and all of us going into the records. So I would object to that.

"The Court: Sustained.

\* \* \*

"Q. Are there any psychiatric reasons for your hospitalization, such as schizophrenia, depression, anything along those lines which you are aware of?

"A. No.

"Mr. Clifford: I would object. Again, it sounds like we are in a privileged area. I don't know if we are asking him if he is apparently schizophrenic. I think we are.

"The Court: Anyway I found the question objectionable. I am going to sustain the objection.

\* \* \*

"A. They offered me an opportunity to go into a Halfway House; I turned it down.

"Q. And why did they feel a Halfway House would be beneficial to you, if you know?

"Mr. Clifford: I would object, your Honor.

"The Court: Sustained."

from cross-examining the state's key witness on facts highly probative of the witness' credibility, capacity to perceive and ability to recall facts.[3] The Appellate Court found no error in the trial court's rulings, holding that the court had provided the defendant wide latitude in cross-examining Knous and that the defendant had failed to make the necessary preliminary showing that the failure to produce the records would likely impair his constitutional right to confrontation. Id., 317. This appeal ensued.

The people of this state enjoy a broad privilege in the confidentiality of their psychiatric communications and records, including those pertaining to their diagnosis, prognosis or treatment for alcohol abuse or alcoholism. See General Statutes §§ 17-155bb (b), 52-146d, 52-146e.[4] A criminal defendant has a constitutional

---

[3] The defendant raised three other claims of error to the Appellate Court which we did not certify for this appeal.

[4] General Statutes § 17-155bb (b) provides: "The commission shall not permit the disclosure of the identity, diagnosis, prognosis or treatment of any such patient which would constitute a violation of federal statutes concerning confidentiality of alcohol or drug patient records and any regulations pursuant thereto, or as they may be amended from time to time; and shall adopt regulations to protect the confidentiality of information obtained by it."

"[General Statutes] Sec. 52-146d. (Formerly Sec. 52-146a). PRIVILEGED COMMUNICATIONS BETWEEN PSYCHIATRIST AND PATIENT. DEFINITIONS. As used in sections 52-146c to 52-146i, inclusive:

"(1) 'Authorized representative' means (A) a person empowered by a patient to assert the confidentiality of communications or records which are privileged under sections 52-146c to 52-146i, inclusive, or (B) if a patient is deceased, his personal representative or next of kin, or (C) if a patient is incompetent to assert or waive his privileges hereunder, (i) a guardian or conservator who had been or is appointed to act for the patient, or (ii) for the purpose of maintaining confidentiality until a guardian or conservator is appointed, the patient's nearest relative;

"(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in

right to cross-examine state witnesses, however, which
may include impeaching or discrediting them by

the accomplishment of the objectives of diagnosis and treatment, wherever
made, including communications and records which occur in or are pre-
pared at a mental health facility;

"(3) 'Consent' means consent given in writing by the patient or his autho-
rized representative;

"(4) 'Identifiable' and 'identify a patient' refer to communications and
records which contain (A) names or other descriptive data from which a
person acquainted with the patient might reasonably recognize the patient
as the person referred to, or (B) codes or numbers which are in general
use outside of the mental health facility which prepared the communica-
tions and records;

"(5) 'Mental health facility' includes any hospital, clinic, ward, psy-
chiatrist's office or other facility, public or private, which provides inpa-
tient or outpatient service, in whole or in part, relating to the diagnosis
or treatment of a patient's mental condition;

"(6) 'Patient' means a person who communicates with or is treated by
a psychiatrist in diagnosis or treatment;

"(7) 'Psychiatrist' means a person licensed to practice medicine who
devotes a substantial portion of his time to the practice of psychiatry, or
a person reasonably believed by the patient to be so qualified."

"[General Statutes] Sec. 52-146e. DISCLOSURE OF COMMUNICATIONS. (a)
All communications and records as defined in section 52-146d shall be con-
fiential and shall be subject to the provisions of sections 52-146d to 52-146j,
inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no
person may disclose or transmit any communications and records or the
substance or any part or any resume thereof which identify a patient to
any person, corporation or governmental agency without the consent of
the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what
person or agency the information is to be disclosed and to what use it will
be put. Each patient shall be informed that his refusal to grant consent
will not jeopardize his right to obtain present or future treatment except
where disclosure of the communications and records is necessary for the
treatment.

"(c) The patient or his authorized representative may withdraw any con-
sent given under the provisions of this section at any time in a writing
addressed to the person or office in which the original consent was filed.
Withdrawal of consent shall not affect communications or records disclosed
prior to notice of the withdrawl."

Both parties have assumed, and therefore so do we for the purposes of
this appeal, that the alcohol treatment and psychiatric privileges are coex-
tensive and have the same exceptions. See *In re Robert H.,* 199 Conn. 693,

attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. *Delaware* v. *Fensterer,* 474 U.S. 15, 19, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (per curiam); *Davis* v. *Alaska,* 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Storlazzi,* 191 Conn. 453, 457, 464 A.2d 829 (1983). Thus, in some instances, a patient's psychiatric privilege must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility.[5] *State* v. *Hufford,* 205 Conn. 386, 401–402, 533 A.2d 866 (1987); *State* v. *Pierson,* 201 Conn. 211, 227, 514 A.2d 724 (1986); see also *Davis* v. *Alaska,* supra, 320 (defendant's right to cross-examine for bias is paramount to state's policy of protecting juvenile offender's identity). The defendant's right of cross-examination does not, however, allow him to discredit and impeach "in whatever way, and to whatever extent, the defense might wish." *Delaware* v. *Fensterer,* supra, 20; *Ohio* v. *Roberts,* 448 U.S. 56, 73 n.12, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). We have therefore directed trial courts to engage in a specific procedure designed to accommodate this inherent tension.

---

709, 509 A.2d 475 (1986) (same privilege applies regarding sexual assault victim's disclosures to rape crisis counselors); see also *State* v. *Rollinson,* 203 Conn. 641, 654, 526 A.2d 1283 (1987).

[5] It is of no moment in this case whether a defendant's constitutional right to discredit witnesses by accessing their psychiatric records stems from the sixth amendment's confrontation clause; *Davis* v. *Alaska,* 415 U.S. 308, 315–16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); from the fourteenth amendment's due process clause, as proposed by four justices of the United States Supreme Court; *Pennsylvania* v. *Ritchie,* 480 U.S. 39, 56, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987); or from either the confrontation or due process clause of our state constitution. Conn. Const., art. I, § 8; see *State* v. *Hufford,* 205 Conn. 386, 401–402, 533 A.2d 866 (1987). We postpone deciding this question until we have a case in which it would make a difference or until the United States Supreme Court offers us further guidance.

If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that "there is a reasonable ground to believe" that the failure to produce the records would likely impair his right to impeach the witness. *State* v. *Pierson,* supra, 225; *State* v. *Esposito,* 192 Conn. 166, 179, 471 A.2d 949 (1984). If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. A witness' refusal to consent to such an in camera inspection entitles the defendant to have the witness' testimony stricken. *State* v. *Burak,* 201 Conn. 517, 524, 518 A.2d 639 (1986); *State* v. *Bruno,* 197 Conn. 326, 331, 497 A.2d 758 (1985), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986); *State* v. *Esposito,* supra, 179–80.

Upon inspecting the records in camera, the trial court must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. *State* v. *Esposito,* supra, 176; *State* v. *Storlazzi,* supra, 459 n.4. If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. *State* v. *Hufford,* supra, 404; *State* v. *Pierson,* supra, 228. Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not dis-

turb unless abused. *State* v. *Herring,* 210 Conn. 78, 109, 554 A.2d 686 (1989); *State* v. *Kelly,* 208 Conn. 365, 380, 545 A.2d 1048 (1988).

In this case, in order to induce the trial court to inspect the records in camera, the defendant had to make a threshold showing that there was a reasonable probability that the records would reveal that "at any pertinent time" Knous' alcohol problem affected his testimonial capacity "to a sufficient degree to warrant further inquiry." *State* v. *Pierson,* supra, 225–26; *State* v. *Esposito,* supra, 180.[6] Upon reviewing the record, the Appellate Court agreed with the trial court that the defendant had failed to make such a showing. *State* v. *D'Ambrosio,* supra, 14 Conn. App. 317. We agree.

Defense counsel established no more than that Knous had been an alcoholic for two years prior to the incident, had undergone court ordered alcohol treatment, including group and individual therapy, had occasionally used other drugs and had consumed alcohol on the day of the incident. The court received no information

---

[6] The Appellate Court stated that "[t]he defendant is required to make 'a plausible showing that [these psychiatric records] would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses.' *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 873, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982)." *State* v. *D'Ambrosio,* 14 Conn. App. 309, 317, 541 A.2d 880 (1988). The Appellate Court apparently gleaned this standard from *Pennsylvania* v. *Ritchie,* 480 U.S. 39, 58 n.15, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), which quoted from *Valenzuela-Bernal* after stating: "Ritchie, of course, may not require the trial court to search through the [witness'] file without first establishing a basis for his claim that it contains material evidence." However, "absent any knowledge of the contents of [his] psychiatric records, it is impossible to determine whether they included relevant impeaching evidence that was not cumulative or was contrary to [his] testimony." *State* v. *Pierson,* 201 Conn. 211, 226, 514 A.2d 724 (1986); *State* v. *Bruno,* 197 Conn. 326, 332, 497 A.2d 758 (1985). Thus, such a showing must, perforce, consist of a certain amount of speculation. We do not read *Ritchie* or *Valenzuela-Bernal* to require a defendant to make a greater showing than our cases have previously required.

regarding how Knous' alcohol or drug use, or any other psychological disorder, might have affected his testimonial capacity sufficiently to require an inspection of his psychiatric records in camera. Thus, neither the trial court nor the Appellate Court erred in concluding that the defendant had not made the requisite showing. A history of alcohol or drug treatment does not automatically make a witness fair game for disclosure of psychiatric records to a criminal defendant. Cf. *State* v. *Burak,* supra, 524–25.

The ultimate propriety of the conclusions reached by the trial court and the Appellate Court depends, however, upon a predicate inquiry: was the defendant afforded a fair opportunity to make the preliminary showing necessary for an in camera inspection? Although the availability of such an opportunity also involves a determination that is, in the first instance, within the trial court's discretion, we have urged trial courts to permit the defendant a certain latitude in his attempt to make such a showing. On this point, *State* v. *Pierson,* supra, offers a useful analogy. In that case the state charged the defendant with sexually assaulting the complainant, a thirteen year old boy. After the complainant himself had testified for the state, his therapist testified regarding the boy's account of the assault. Id., 221. In cross-examining the therapist, the defendant sought to discover any mental aberrations of the complainant that might have reflected upon his credibility. Id., 226–27. To this end the defendant asked the therapist whether he had recently treated the complainant and his mother for "parent-child conflicts," as a hospital record indicated. The defendant intended the question to elicit an answer that would help make a preliminary showing to the trial court that the therapist had further information of the complainant's mental condition affecting his credibility. The trial court upheld the therapist's claim that responding to a ques-

tion about the treatment's purpose would violate the psychiatrist-patient privilege. Id., 221. We found error, explaining that "[w]ithout any opportunity to ascertain whether such information exists, it would ordinarily be impossible for a defendant to lay the groundwork demanded by [our cases] as preliminary to a fair judicial determination of the availability of evidence of the mental condition of a witness significantly related to his testimonial capacity or credibility." Id., 226–27.

Although the instant case involves privileged records rather than privileged communications, the same principle applies. By sustaining the state's objections, on grounds of psychiatric privilege, to questions posed by defense counsel while she voir dired Knous, the court may well have effectively prohibited counsel from making the showing prerequisite to the court inspecting the records in camera. Specifically, when the court disallowed counsel from inquiring whether Knous had received a diagnosis as a result of his stay at the Connecticut Valley Hospital, whether there were psychiatric reasons for his hospitalization and why counselors thought he should enter a halfway house upon release from the alcohol program, the court may have precluded her from making an already difficult showing. "The privilege cannot be permitted to bar the court from access to such information as is necessary to decide whether the occasion is one where the witness must waive the privilege or have his testimony expurgated from the case." Id., 227; see also *State* v. *Whitaker,* 202 Conn. 259, 272, 520 A.2d 1018 (1987).

On the present record, we cannot conclude that the court's error, which implicates the defendant's constitutional right to impeach and discredit state witnesses, was harmless beyond a reasonable doubt. As the defendant's alleged accomplice, Knous was the state's most vital witness. If his testimony had been discredited or stricken altogether, we cannot be certain that the

jury would have returned the same guilty verdicts. Cf. *State* v. *Gonzales,* 186 Conn. 426, 435, 441 A.2d 852 (1982).[7]

We conclude that this case must be remanded and the defendant given an opportunity to make a preliminary showing that the failure to produce Knous' psychiatric records would likely impair his right to impeach the witness. To the extent that certain of the defendant's questions relevant to making this showing infringe to some degree on Knous' psychiatric privilege, the state must secure Knous' limited waiver of the privilege. If, in the trial court's judgment, the defendant fails to make this showing, the defendant's convictions will stand. Should the court find, however, that the defendant has made the requisite showing, the state must obtain Knous' further waiver for the court to conduct an in camera inspection of the records. If in reviewing the records the court, in its discretion, finds no material especially probative of the witness' capacity to relate the truth, the convictions will stand and the court must seal the records for possible further appellate review. Should the court find such probative material, however, the state must obtain Knous' further waiver for release of the relevant portions of his records to the defendant and the court must grant the defendant a new trial. A new trial will also be

---

[7] The state contends that we can find harmless error because when asked if there were any psychiatric reasons for his hospitalization, the witness answered "No," before the state could object. This was only one of three erroneous rulings, however. In any case, the court made clear by its rulings that it did not intend to allow, even during voir dire, any questions that touched in any fashion upon Knous' psychiatric privilege.

In remanding this case, we anticipate that the trial court may well offer the defendant an opportunity to pursue this line of questioning beyond the three questions previously posed to the witness. Although placing a limit on such questioning is a matter within the trial court's discretion, the record below may well reflect trial counsel's decision to abort a line of questioning prematurely in order to comply with adverse rulings from the bench.

required if at any juncture Knous refuses to waive his privilege. See *Pennsylvania* v. *Ritchie,* supra, 58; *State* v. *Pierson,* supra, 229; *State* v. *Esposito,* supra, 179–80.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the trial court for further proceedings consistent with this opinion.

In this opinion the other justices concurred.