[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendants were arrested on April 30, 1992 in the south end of Hartford, after the 1992 Buick LeSabre automobile in which they were riding was stopped and searched by officers of the Hartford Police Department. A search of a duffle bag located on the floor of the rear passenger compartment of the vehicle resulted in the discovery of approximately one kilogram of cocaine. In a subsequent search of the Buick's trunk, the officers found a suitcase containing $22,020.00 in cash. From defendant Dieppa's person, the police seized $2111.00 in cash and a Message Center beeper. Defendant Jurado Lopez was in possession of $507.00 in cash and an CT Page 6219 airline ticket in a name that matched the name on a luggage ticket found on the suitcase in the trunk.
Defendants Dieppa and Jurado Lopez have moved to suppress the cocaine, the money found in the trunk, and the items seized from their persons incident to their arrests.[1] An evidentiary hearing on the defendants' motion was held on October 12 and 14, 1993, and both sides submitted written briefs in support of their positions. Having considered the evidence presented at the hearing, the arguments of counsel and their written memoranda, the Court finds that the stop of the defendants and the seizure of the items from the Buick and their persons were lawful. Accordingly, for the reasons that follow, the defendants' motion to suppress is denied.
FACTS
The Court finds that the following facts were adduced at the hearing on the motion to suppress.
On April 30, 1992, Hartford Police Officer Stephen Wroniak was patrolling in the south end of Hartford. At about 12:30 p. m., he heard the police dispatcher announce an active burglary at 81 Franklin Avenue, approximately a quarter of a mile away from where he was located. The complainant told the dispatcher that a man tried to break through the back door of 81 Franklin Avenue and when she and her mother-in-law intervened, he fled. She described the suspect to the dispatcher as being thin and wearing jeans and a hat. Since Officer Wroniak was so close to the scene of the alleged attempted burglary, he cancelled one of the assigned units and told the dispatcher that he would respond to the call.
Officer Wroniak arrived at the scene within three to four seconds after hearing the police dispatch and exited his police car to speak with a woman on the front porch of 81 Franklin Avenue. This woman described the suspect as a very light-skinned Hispanic male who was wearing a white shirt with reddish stripes, jeans, and a white baseball cap. Officer Wroniak broadcasted over his police radio the more detailed description of the suspect and canvassed the area. Although the woman with whom he spoke told him that the suspect had fled north, Officer Wroniak, who had come from a northerly direction and had not seen anyone matching the suspect's description going north on Franklin Avenue, surmised that the CT Page 6220 suspect went west through the back yards of the residences on Franklin Avenue.
After searching the area on foot for a few minutes, Officer Wroniak, who was standing near his cruiser in front of 81 Franklin Avenue heard a police radio dispatch report of a traffic accident near the corner of Franklin and Pawtucket Streets. Since he was standing approximately 40 to 50 feet from the corner, Officer Wroniak looked in that direction in order to observe the accident. When he directed his attention to the corner of Franklin Avenue and Pawtucket Street, Officer Wroniak saw a blue Buick with three individuals in it, which was stopped at the intersection of Pawtucket Street and Franklin Avenue, facing east, as if it had come from the west, the direction in which Officer Wroniak believed the suspect had fled. Officer Wroniak noticed that the driver, a light-skinned Hispanic male was wearing a white baseball cap and a striped shirt, and generally fit the description given of the burglary suspect of the incident he was investigating. Officer Wroniak also noted that when he made eye contact with the driver, the latter had a shocked and apprehensive expression on his face. The driver looked away anxiously, looked back at Officer Wroniak and appeared very nervous. The driver then sped onto Franklin Avenue, past Officer Wroniak. As the Buick sped by him, Officer Wroniak, who at the time was within 12 feet of the driver, observed the driver and confirmed that he generally fit the description of the burglary suspect. The driver appeared fidgety to Officer Wroniak. The driver looked at Officer Wroniak very closely, and quickly looked away and sped off. The driver turned left onto Franklin Avenue and drove north, squealing the tires as he left.
Given that the driver of the Buick generally fit the description of the burglary suspect that he was located around the corner from where the attempted burglary allegedly occurred, and knowing from past experience that burglars often have a vehicle near the scene of the crime in order to flee the area, Officer Wroniak believed that the driver of the Buick was a likely suspect of the attempted burglary. Therefore, after the Buick passed him, Officer Wroniak entered his car, activated the strobe lights and siren, made a U-turn onto Franklin Avenue and proceeded after the car. The Buick increased speed, made an abrupt turn onto Anaway Street, sped up Anaway Street a short distance as Officer Wroniak followed CT Page 6221 behind it, and made an abrupt left turn onto Dean Street. It was obvious to Officer Wroniak that the driver of the Buick was operating the vehicle in an evasive manner and that he was trying to get away. Nevertheless, Officer Wroniak was able to get close enough to get a license plate number so he could determine whether the Buick was stolen. As Officer Wroniak was attempting to check the plate, a cruiser driven by Officer Reynolds turned onto Dean Street, drove toward the Buick and blocked it from the front, while Officer Wroniak blocked it at the rear.
After the Buick was blocked in, Officer Wroniak exited his cruiser and approached the vehicle, which he could see was occupied by three individuals: the driver, defendant Dieppa; a passenger in the front, defendant Miguel Rivera Newton; and a passenger in the back, defendant Edilberto Jurado Lopez. As Officer Wroniak approached and stood alongside the driver's door of the Buick, he looked at the defendants' hands to make sure there were no weapons in sight. Wroniak saw Jurado Lopez making some very hasty and furtive hand movements into a bag which was located partially on the seat and partially on Jurado Lopez's lap. Jurado Lopez appeared to be trying to get something out of the bag or place something in it. As Officer Wroniak stepped away from the Buick, he faced Jurado Lopez with his service revolver drawn and shouted at him to raise his hands. Jurado Lopez then stuffed the bag on the floor of the car.
Upon observing Jurado Lopez with his hand in the bag, Officer Wroniak became concerned for his safety because he believed that there might be a weapon in the bag. With his gun still drawn, Officer Wroniak removed Dieppa from the car, frisked him for weapons and placed him in his cruiser. Jurado Lopez and Rivera Newton were also patted down and placed in the police car.
Although the defendants were secured, Officer Wroniak was still concerned for his safety, so he made a cursory search of the Buick's passenger compartment and the duffle bag in which Jurado Lopez had put his hand. Officer Wroniak was looking for guns, burglary tools or other fruits of the crime. In the glove compartment he found a rental agreement reflecting that the Buick was a leased vehicle. The duffle bag contained a brick-like package wrapped in brown wrapping tape which had a slit in it revealing a hard, rock-like white substance. Based CT Page 6222 on his training and experience, Officer Wroniak believed that the package contained cocaine and that there might be more narcotics in the car. Officer Wroniak then searched the trunk and found a suitcase. He opened the suitcase and discovered approximately $22,000 in cash.
After finding the suspected narcotics and cash, the defendants were placed under arrest. The defendants were searched more thoroughly and $2,111.00 cash and a Message Center beeper were found on Dieppa's person. Jurado Lopez had in his possession $507.00 cash and an airline ticket bearing the name "Moligna" which matched the name on the luggage tag on the suitcase containing the $22,020.00. With respect to the duffle bag, Jurado Lopez testified at the evidentiary hearing on the instant motion that it belonged to him and that he had purchased it in Hartford. Although Jurado Lopez claimed to own the clothes in it, he denied ownership of the cocaine found in the duffle bag.
Subsequent investigation revealed that the Buick in which the defendants were riding was owned by the Alamo Rental Car Company and had been rented on April 17, 1992, by an individual named "Robert Pagan." Pursuant to the rental agreement, only two persons were authorized to operate the Buick, neither of whom was a defendant in this case. At the hearing on the instant motion, Dieppa testified that a friend of his named "Pedro," who had control of the Buick, loaned it to him a few hours before it was stopped by the police. However, Dieppa did not know Pedro's last name and did not know where he lived. According to Dieppa, he had only known Pedro for one month before Pedro loaned him the car. Dieppa also could not name the city or state where he got the car from Pedro. Moreover, Dieppa did not know that the Buick had been rented and had no knowledge of the individuals noted in the Alamo rental agreement.
DISCUSSION
As noted above, defendants Jurado Lopez and Dieppa have moved to suppress the purple duffle bag and the quantity of cocaine found therein, cash found on their person, an airline ticket found on Jurado Lopez, and the cash found in a closed suitcase in the trunk of the vehicle. The defendants argue that the warrantless search and seizure that uncovered these items was illegal under the Fourth Amendment to the United CT Page 6223 States Constitution, as applied to the states through theFourteenth Amendment, and under Article First, §§ 7 and 9, of the Connecticut Constitution.
A. REASONABLE EXPECTATION OF PRIVACY
The State contends that the defendant Dieppa has no right to challenge the search of the Buick automobile because he has failed to establish a reasonable expectation of privacy in either the vehicle or the particular items searched. In addition, the State, while conceding that Jurado Lopez may have a reasonable expectation of privacy in the duffle bag, contends that he may not assert a reasonable expectation of privacy in the trunk of the car or the suitcase found therein.[2]
"It is a well recognized precept of constitutional interpretation that the fourth amendment protects people, not places." State v. Brosnan, 24 Conn. App. 473, 478,589 A.2d 1234 (1991), modified, 221 Conn. 788, 608 A.2d 49 (1992), citing Katz v. United States, supra.
 To receive fourth amendment protection against unreasonable searches and seizures, a defendant must have a legitimate expectation of privacy in the invaded area. . . . "Absent such an expectation, the subsequent police action has no constitutional ramifications." . . . The determination of whether the defendant had a reasonable expectation of privacy in the area searched requires a two part factual inquiry: first, whether the defendant has exhibited an actual subjective expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable. . . .
State v. Rodriguez, 223 Conn. 127, 132, 613 A.2d 211 (1992) (citations omitted). For the purposes of a motion to suppress, "a defendant must sustain the burden of demonstrating a legitimate expectation of privacy in the area searched. . . ." State v. Delarosa, 16 Conn. App. 18, 31-32,547 A.2d 47 (1988), citing State v. Morrill, 197 Conn. 507, 542, CT Page 6224498 A.2d 76 (1985). See also, United States v. Ponce,947 F.2d 646, 649 (2d Cir. 1991) (for purposes of standing to object to search of automobile, burden is on defendants to show a legitimate basis for being in the car).
In State v. Rodriguez, supra, our Supreme Court addressed the issue of a reasonable expectation of privacy with respect searches of automobiles:
 Whether the defendant "possessed a reasonable expectation of privacy in the automobile requires a factual inquiry into all the relevant circumstances surrounding its [search]." State v. Pittman, 209 Conn. 596, 601, 553 A.2d 155
(1989). . . . Even individuals who do not legally own an automobile may be entitled to challenge its search. See State v. Darwin, [161 Conn. 413, 420, 288 A.2d 422
(1971)]; see also United States v. Garcia, 897 F.2d 1413, 1418 (7th Cir. 1990) ("[i]f an individual has the owner's permission to use [the automobile], society surely recognizes this [expectation of privacy] as reasonable") . . .
233 Conn. at 133.
1. Defendant Dieppa
Defendant Dieppa contends that he had a reasonable expectation of privacy in the Buick because he was operating the car with "Pedro's" permission. No Connecticut case has addressed the issue of whether a defendant's status as the operator qua operator of an automobile, without more, demonstrates a legitimate expectation of privacy in the automobile that was the subject of a challenged search. However, other jurisdictions have decided the issue and have held that the status of operator does not, by itself, create a reasonable expectation of privacy in the vehicle. It is the defendant's burden to demonstrate a legitimate possessory interest in the vehicle. See, e.g., United States v. Ponce,947 F.2d at 649 (the defendant's burden of showing a legitimate basis for being in the car "cannot be made simply by having been observed using the car"). Accord, UnitedCT Page 6225States v. Sanchez, 635 F.2d 47, 64 (2d Cir. 1980).
In State v. Barter, 833 S.W.2d 372, 310 Ark. 94 (Ark. 1992), the Arkansas Supreme Court was faced with a factual scenario identical to the one posed by the present case. The defendant had been arrested while operating a vehicle in which a warrantless search uncovered marijuana. At the suppression hearing, the defendant testified that he had obtained possession of the vehicle from a man named J.R. Swan. However, the police had discovered that the vehicle was rented to a Paul Sotello. The court, in holding that the defendant had no legitimate possessory interest in the car, noted than the defendant had offered no testimony to "show a connection between Sotello, the man who had possessory right to the car, and J.R., the man from whom Barter received the car." Id. at 374.
Similarly, in United States v. Sanchez, 943 F.2d 110 (1st Cir. 1991), the defendant, who testified that he borrowed the car from the owner, was found to have no legitimate expectation of privacy in the automobile which was the subject of the challenged search. In determining that the defendant did not have a legitimate possessory interest in the vehicle, the court noted that the defendant testified that he had "gained possession [of the automobile] from a friend about whom he knew very little — not even his last name." Id. at 114. The court noted that there was no evidence that the defendant had used the car previously or had obtained direct authority from the actual owner to use the car. The court concluded that these factors, when weighed against the factors supporting an expectation of privacy, such as the defendant's sole possession of the car on a long trip, weighed against the defendant's expectation of privacy and standing. Id. The court held that "[h]ad Sanchez demonstrated a more intimate relationship with the car's owner or a history of regular use of the [car] — from which the presumption of permission could be drawn — we would have been likely to conclude that the totality of circumstances established a legitimate expectation of privacy."
Id.
In United States v. Rascon, 922 F.2d 584, 587 (10th Cir. 1990), the defendant testified at the suppression hearing that a friend, Avita, had loaned him the searched automobile, CT Page 6226 although Avita was not the registered owner of the car. In holding that the defendant had not demonstrated a legitimate possessory interest in the vehicle, the court noted that "there was a complete absence of evidence concerning Avita's possession of the car. Thus, . . . the defendant failed to at least state that he had gained possession from the owner or someone with the authority to grant possession." Id. at 587 (citations and internal quotation marks omitted). Although the defendant offered testimony indicating that the car was owned by Avita's brother-in-law and invited the court to infer from this fact that Avita's possession was legitimate, the court held that "[t]o presume that Avita's possession of car was legitimate in the absence of any such evidence would be inconsistent with the burden of proof on this issue, which lies with the proponent of a motion to suppress." Id., citingRakas v. Illinois, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421,58 L.Ed.2d 387 (1978).
Additionally, other courts have specifically addressed the issue of whether the driver of a vehicle rented by a third party can possess a reasonable expectation of privacy in the rented car. In United States v. Roper, 918 F.2d 885 (10th Cir. 1990), the Tenth Circuit held that a driver of a rental vehicle had no reasonable expectation of privacy in it because he was not named on the rental agreement or any other documents, either as a renter or authorized driver and made no showing that the rental company allowed him to drive the car legitimately. Id. at 887.
In United States v. Boruff, 909 F.2d 111, 113-114, 117
(5th Cir. 1990), the court held that, although the defendant was the driver and sole occupant of the rented car, he had no reasonable expectation of privacy in it because the rental agreement legally only allowed the person who rented the car to operate it and the defendant knew that. Other courts are in accord with this result. See e.g., United States v.Obregon, 748 F.2d 1371, 1374-75 (10th Cir. 1984) (defendant driver of rental car rented to unrelated third party had no evidence of any agreement with rental company permitting defendant to operate vehicle); United States v. McConnell,500 F.2d 347, 348 (5th Cir. 1974) (Defendant found not to have a reasonable expectation of privacy in a rental vehicle, even though he used his credit card to rent the car in another person's name); United States v. Taddeo, 724 F. Sup. 81, 84
(W.D.N.Y. 1989). CT Page 6227
In the present case, evidence at the suppression hearing indicated that the vehicle was rented by a "Robert Pagan" and a "Louis Vasquez." (State's Exhibit #3.) Dieppa testified at the suppression hearing that he borrowed the automobile from his friend "Pedro." However, he also testified that he did not know Pedro's last name, and did not remember where or when he had received the car from Pedro. Moreover, Dieppa did not know if Pedro owned the car, leased it, or how he acquired it. The State, on the other hand, offered evidence that the rental agreement, which was located in the glove box, allowed only Pagan and Vasquez to operate the automobile. (State's Exhibit #3.) Therefore, given the foregoing facts, the Court finds that defendant Dieppa has not demonstrated a legitimate possessory interest in the automobile. His lack of knowledge concerning the ownership of the Buick or even of "Pedro," leads the Court to conclude that, although Dieppa may have had a subjective expectation of privacy in the Buick, it was not a reasonable one and not an expectation of privacy which society is prepared to recognize as reasonable.
2. Defendant Jurado Lopez
As to defendant Jurado Lopez, who was a passenger in the vehicle, the general rule is that "[a] passenger in a motor vehicle, who fails to demonstrate a possessory interest in the car itself or in any of the seized evidence, has no reasonable expectation of privacy in the area of the vehicle searched, and thus, he is precluded from contesting the validity of the search." State v. Burns, 23 Conn. App. 602, 611-12,583 A.2d 1296 (1990), quoting State v. Delarosa, 16 Conn. App. at 32. In the present case, however, Jurado Lopez claims a legitimate expectation of privacy in the duffle bag which contained the kilo of cocaine and the suitcase containing the $22,000 cash found in the trunk of the automobile.
With respect to the duffle bag, Jurado Lopez claimed at the suppression hearing that he owned the duffle bag. He testified that he had purchased the bag in Hartford, that it contained his clothing and that he had a subjective expectation of privacy in it. Regarding the suitcase, Jurado Lopez contends that he had a reasonable expectation of privacy in it because, at the time of his arrest, he had in his pocket a baggage claim ticket that matched the ticket on the suitcase. CT Page 6228
The State concedes that Jurado Lopez had an expectation of privacy in the duffle bag. The State, however, contends that Jurado Lopez may not claim a similar interest in the suitcase because the baggage claim ticket did not bear Jurado's name. Rather, it was issued to a "Molinga/F." Moreover, at the suppression hearing, Jurado Lopez did not testify that the suitcase was his and failed to establish any connection whatsoever with Molinga. Additionally, Jurado Lopez did not testify that he had a subjective expectation of privacy in the suitcase. Accordingly, the Court finds that possession of the baggage claim ticket cannot by itself create either a subjective or a reasonable expectation of privacy such as to entitle him to challenge the legality of the search of the suitcase.
 B. THE LEGALITY OF THE STOP AND SUBSEQUENT SEARCH AND SEIZURE
Because defendant Jurado Lopez had a reasonable expectation of privacy in the duffle bag, and both defendants have a right to challenge the legality of the stop and the search of their persons, the Court must next consider whether the police lawfully stopped the defendants in order to effectuate the subsequent searches and seizures.
 "The fourth amendment to the federal constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (internal quotation marks omitted.) State v. Floyd, 217 Conn. 73, 79-80, 584 A.2d 1157 (1991).
State v. Kyles, 221 Conn. 643, 659, 607 A.2d 355 (1992) "[A] search conducted without a warrant issued upon probable cause is `per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"State v. Badgett, 200 Conn. 412, 423, 512 A.2d 160, cert.denied, 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986) (citations omitted). The burden is on the State to establish CT Page 6229 the applicability of the exception to the particular case. Id. at 424.
The State argues that three particular exceptions to the warrant requirement are directly applicable to this case: (1) the Terry stop exception articulated in Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); (2) the automobile exception; see, State v. Miller, 227 Conn. 363,378, 630 A.2d 1315 (1993); and (3) the search incident to a valid arrest exception. See State v. Badgett,200 Conn. at 424.
1. The Seizure
In determining whether a warrantless search and seizure is lawful, the threshold inquiry is at what point was the defendant seized.[3] State v. Oquendo, 223 Conn. 635, 652,613 A.2d 1300 (1992). A fleeing defendant's constitutional rights against unreasonable searches and seizures are not implicated until the pursuing police officer issues a command to halt.State v. Brokaw, 32 Conn. App. 505, 509, 629 A.2d 1170 (1992), quoting State v. Rivera, 23 Conn. App. 807, 583 A.2d 931
(1990), cert. denied, 217 Conn. 807, 584 A.2d 1192 (1991). Under Article First, § 7, of the Connecticut Constitution, "a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." State v. Greenfield,228 Conn. 62, 68, 634 A.2d 879 (1993), quoting State v.Oquendo, 223 Conn. at 647.
In the instant case, the State concedes that the defendants were seized at the point at which Officer Wroniak first activated his strobe lights and siren. Therefore, under the test articulated in Oquendo for determining whether a seizure has occurred under Article First, § 7, of the Connecticut Constitution, the Court finds that Officer Wroniak's initiation of pursuit of the defendants' automobile and the activation of the siren and strobe lights were sufficient to make a reasonable person believe that he was not free to leave. Therefore, the Court finds that the defendants were seized at the point of the pursuit.
 2. The Legality of The Terry Stop: Reasonable and Articulable Suspicion
CT Page 6230
The State argues that the initial stop was justified as a valid investigative stop under the doctrine of Terry v.Ohio, 392 U.S. 1 (1968). Both the Federal Constitution and
 [a]rticle first, §§ 7 and 9 of [the Connecticut constitution] permit a police officer `inappropriate circumstances and in an appropriate manner' to detain an individual for investigative purposes even if there is no probable cause to make an arrest. . . . In determining whether the detention was justified in a given case, a court must consider if "`[b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom.
State v. Oquendo, 223 Conn. at 654 (citations omitted.) "Once a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative `stop' of the suspect to confirm or dispel his suspicions and may `frisk' the suspect to determine if the person is carrying a weapon." State v.Kyles, 221 Conn. at 660, citing Terry v. Ohio, supra. Additionally, the officer "conducting a Terry stop of an automobile may search the passenger compartment of the automobile for weapons, limited to areas where the weapon might be hidden, if the officer reasonably believes the suspect is potentially dangerous." State v. Kyles,221 Conn. at 660, citing Michigan v. Long, 463 U.S. 1032,103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). "During the course of such a search, the officer may legitimately uncover incriminatory evidence that establishes probable cause to arrest the suspect." Id., (citations omitted).
In the present case, Officer Wroniak had a reasonable and articulable suspicion that the driver of the Buick, defendant Dieppa, had been involved in the attempted burglary of 81 Franklin Avenue. Officer Wroniak responded to the scene of CT Page 6231 the attempted burglary within minutes after the initial complaint had been made. He was informed by the complainant that the suspect was a light skinned Hispanic male wearing jeans, a white baseball cap and a white shirt with reddish stripes. After an initial investigation of the scene of the alleged crime, the officer believed that the suspect had fled westward through the back yard of the house on Franklin Avenue, because he had not seen anyone matching the suspect's description travelling north on Franklin Avenue as he had approached the alleged crime scene moments earlier. Within a short time after the attempted burglary, while the officer was still within the immediate vicinity of the attempted burglary, the officer observed the automobile that the defendant was operating coming from the direction in which the officer had determined that the suspect had fled. See, State v. Kyles,221 Conn. at 661, n. 11, citing State v. Aillon, 202 Conn. 385,400, 521 A.2d 370 (1985) (proximity of time and place of stop to crime investigated is highly significant to determination of reasonable and articulable suspicion).
Officer Wroniak observed that the driver of the car was a light-skinned Hispanic, wearing a white baseball cap and a striped shirt. Although the defendant was wearing a purple shirt with reddish stripes, and the complainant had described the suspect as wearing a white shirt with reddish stripes, such a discrepancy does not necessarily undermine the reasonable suspicion of the police officer. "`[R]easonable suspicion is less a demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.'" State v. Cofield, 220 Conn. 38, 47-48, 595 A.2d 1349
(1991) (Glass, J., dissenting). See also, State v. Mitchell,204 Conn. 187, 196, 527 A.2d 1168, cert. denied, 484 U.S. 927
(1987) (existence of discrepancies between victim's description and defendant's actual appearance does not vitiate reasonable and articulable suspicion).
Although the complainant indicated that the defendant had fled on foot, the officer knew from his police experience that burglars often leave an automobile within the vicinity of the crime scene in order to quickly escape. Furthermore, the defendant, who drove within 12 feet of the officer, appeared CT Page 6232 "shocked and nervous," avoided eye contact with the officer, and then nervously looked back at the officer. The driver then turned the corner and squealed his tires as he sped away. Based on the matching description, the defendant's nervous behavior upon being observed by the officer, and the manner in which the defendant operated the automobile, the officer believed that the defendant Dieppa was the suspected burglar for whom he had been searching. Given these circumstances, therefore, the Court finds that before Officer Wroniak activated his lights and siren, he had a reasonable and articulable suspicion which would have justified stopping the vehicle.
The Buick fled before Officer Wroniak activated his emergency equipment and a defendant's initial evasive actions can be a basis for a determination of reasonable and articulable suspicion. See, State v. Oquendo,223 Conn. at 656-57 (defendant's flight, not provoked by officer's conduct, may be considered in determining whether reasonable and articulable basis of suspicion existed). It did not stop in response to the officer's command to stop. Defendant Dieppa continued to attempt to evade capture. He continued to flee until another police cruiser blocked his way. Thus, the reasonable suspicion which existed before activation of the lights and siren heightened the officer's reasonable suspicion that defendant Dieppa, at least, was recently involved in criminal activity. Therefore, the officers were justified in stopping the Buick in order to investigate Dieppa's connection with the alleged attempted burglary. See, State v. Kyles,supra.
3. The Legality of the Searches
a. The Terry Stop Protective Search
Having determined that Officer Wroniak had a reasonable and articulable suspicion to stop the Buick, the Court next must decide whether he had a reasonable and articulable suspicion to believe that the bag Jurado Lopez was handling in the rear seat contained a weapon. In this regard, to determine whether a protective search of weapons is justified pursuant to a valid Terry stop, the United States Supreme Court has held "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted CT Page 6233 in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. See also, State v.Kyles, 221 Conn. at 660, citing Michigan v. Long, supra
(officer conducting Terry stop of automobile may search passenger compartment if officer reasonably believes suspect is potentially dangerous).
Upon stopping the automobile on Dean Street, Officer Wroniak was able to confirm that Dieppa was a light-skinned Hispanic male wearing a stripped shirt and white cap. At this point in time, the officer believed that he had stopped a car driven by the burglary suspect he had been pursuing on Franklin Avenue. Additionally, when he removed Dieppa from the vehicle, Officer Wroniak observed that he was of thin build, further matching the complainant's description of the burglary suspect. Moreover, as he approached the car, Officer Wroniak saw Jurado Lopez making furtive movements in the rear of the car. He observed Jurado Lopez with his hand in the duffle bag partially on his lap, but he could not see whether Jurado Lopez was stuffing something into or removing something from the bag. Although furtive movements do not necessarily give rise to a presumption that there are weapons in a car,State v. Badgett, 200 Conn. at 430-31, they can, given other circumstances that create a legitimate fear that a suspect is armed. See, State v. Escobales, 16 Conn. App. 272, 273,547 A.2d 553 (1988).
The officer became concerned for his safety because of the potential presence of burglary tools or weapons in the bag. The officer testified that the search of the duffle bag was to uncover any weapons that might have been used in the commission of the crime. The officer knew from his experience that burglars often carry weapons and burglary tools which could be used as weapons. Fearing that Jurado Lopez might have a weapon in the bag the officer instructed him to place his hands in the air.
Based on the fact that defendant Dieppa generally fit the description of the suspected burglar, Dieppa's attempts to evade the police in a high speed chase, defendant Jurado Lopez's furtive movements regarding the duffle bag, the officer's experience indicating that burglars often carry dangerous weapons or burglary tools, and the fact that the officer was investigating a felony attempted in broad daylight, the officer's belief that the occupants might have CT Page 6234 been armed and dangerous was reasonable under the circumstances and the officer was justified in searching the duffle bag for weapons. See, State v. D'Ambrosio, 14 Conn. App. 309,313, 541 A.2d 880 (1988). See also, United Statesv. Walker, 924 F.2d 1, 4 (1st Cir. 1991) (officer's past experience indicating that burglars often carry weapons or other dangerous objects and burglary suspect's evasive conduct supported officer's suspicion that burglary suspect may have been armed and dangerous); United States v.Crittendon, 883 F.2d 326, 329 (4th Cir. 1989) (similar facts; same result); State v. Nichols, 549 P.2d 235, 238, 26 Ariz. App. 455
(Ariz.App. 1976) (same); 3 W. LaFave, Search andSeizure (2d ed. 1987), § 9.4(a), p. 506 (noting that many courts hold that officers may conduct protective search for weapons whenever they approach a suspect believed to be involved in a burglary). Upon discovering the large quantity of cocaine in the duffle bag as a result of the investigative stop and protective search, the officer had probable cause to arrest the defendants for narcotics offenses.
b. Probable Cause to Search
Both Article First, § 7, of the Connecticut Constitution and "the fourth amendment [are] not violated by a roadside warrantless search of an automobile if the police have probable cause to search the automobile and if obtaining a warrant would be impracticable because of the possibility that the automobile will be moved out of the jurisdiction." Statev. Miller, 227 Conn. at 378, citing State v. Dukes, 209 Conn. 98,126, 547 A.2d 10 (1988). See also, State v. Patterson,31 Conn. App. 278, 308, 624 A.2d 1146 (1993).
 This exception to the warrant requirement requires that the officers have probable cause to believe that the vehicle contains contraband. . . The probable cause determination must be based on objective facts that could have justified the issuance of a warrant by a neutral magistrate at the time the search was made. . . .
 `Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be CT Page 6235 seized are connected with criminal activity or will assist in a particular apprehension or conviction and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched.' (Emphasis in the original; citations omitted.) State v. Delmonaco, 194 Conn. 331, 337, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984).
Id. at 308-309 (citation omitted.)
After removing the defendants from the automobile and frisking them for weapons, Wroniak made a cursory search of the vehicle and removed the duffle bag from the automobile. When searching the duffle bag for weapons, he discovered a wrapped, brick-shaped package with a slice in it revealing a substance that the officer knew from prior experience to be cocaine. Officer Wroniak, who had 18 years experience in police work and had conducted numerous narcotics investigations, believed that the presence of the cocaine in the passenger compartment indicated that the car was being used for "street-level" drug dealing activity. Based on his experience, he believed that there might be additional cocaine hidden in the vehicle because drug dealers frequently hide drugs in the seats, trunk or hood areas of a vehicle and only keep amounts for a quick drop-off or sale on their person or in the passenger compartment.
Accordingly, the Court finds that after discovering the kilo of cocaine in the passenger compartment, the officers had "probable cause to believe that the vehicle contain[ed] contraband," and were justified in searching the trunk. Statev. Patterson, 31 Conn. App. at 309 (defendant seen placing drugs into car); State v. Leonard, 14 Conn. App. 134, 138,539 A.2d 1030 (1988) (discovery of drugs in passenger compartment gave officers probable cause to search trunk); cf. State v.Miller, supra (under Article First, § 7, of the Connecticut Constitution, automobile exception authorizing roadside warrantless searches upon probable cause does not apply when car was impounded, but does apply to roadside searches).
c. Search Incident to a Lawful Arrest
CT Page 6236
Under the Connecticut and Federal Constitutions, a warrantless search of the defendant's person may be conducted incident to a lawful custodial arrest in order to remove any weapons from the defendant and to prevent the concealment or destruction of evidence. State v. Badgett, 200 Conn. at 424-25.See also, State v. Dukes, 209 Conn. at 121; Chimel v.California, 395 U.S. 752, 763, 89 S.Ct. 2034,23 L.Ed.2d 685 (1969).
Prior to uncovering the cocaine and arresting the defendants, Officer Wroniak only performed a protective "pat down" search of the defendants' persons in order to uncover weapons, and he did not seize anything. Upon discovering the drugs in the car and the large quantity of cash in the trunk, the officer placed the defendants under arrest and then conducted a more thorough search of the defendants' persons in order to uncover any additional evidence. Having legally stopped the automobile and discovered the cocaine and the money, the officer had probable cause to arrest the defendants and perform a search incident to arrest which uncovered the items on the defendants' persons. See, State v. Dukes,209 Conn. at 125.
CONCLUSION
The initial stop of the Buick in which the defendants were riding was a lawful Terry stop. The police officers' reasonable and articulable suspicion that the driver, defendant Dieppa, was involved in criminal activity was heightened upon observing Dieppa more closely and seeing defendant Jurado Lopez's furtive movements with the duffle bag. Therefore, the officer was justified in searching the bag for weapons. Once a kilo of cocaine was found in the duffle bag, the officers had probable cause to arrest the defendants, search their persons incident to a lawful arrest, and search the vehicle, including the trunk, without a search warrant. Accordingly, for the foregoing reasons, the defendants' motion to suppress is denied in all respects.
IT IS SO ORDERED.
Dated at Hartford, CT, this 28th day of June, 1994.
BY THE COURT,
C. ESPINOSA, J. CT Page 6237